IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Donald L. Handley, | : | Case No. 1:07-cv-501 |
| | : | |
| Plaintiff, | : | Chief District Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING MOTION FOR |
| | : | SUMMARY JUDGMENT |
| General Security Services Corp, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

This matter is before the Court on Defendant General Security Services Corporation's Motion for Summary Judgment (doc. 50). Plaintiff Donald Handley asserts claims for disability discrimination and retaliation against his former employer in this suit. For the reasons that follow, the Court finds that no material facts are in dispute and that Defendant General Security Services Corporation ("GSSC") is entitled to summary judgment as a matter of law. Defendant's motion is **GRANTED**.

**I.  BACKGROUND**

**A.  Facts Underlying the Dispute**

Unless otherwise noted, this statement of facts is derived from GSSC's Proposed Undisputed Facts (doc. 50-2) and Handley's Response to GSSC's Proposed Undisputed Facts (doc. 58). Donald Handley was employed as a security guard at the John Weld Peck Building ("Peck Federal Building") from 1995 through1999, and then again from 2001 until his termination in September 2006. (Handley Dep. 18-20, 26-27, 56-58.) GSSC, a private security services company, became Handley's employer in October 2004 when GSSC entered into a contract with the Department of Homeland Security ("DHS") and the division within DHS

1

known as the Federal Protective Service ("FPS") to provide security services at the Peck Federal Building.

The terms of the contract between DHS and GSSC, with the exception of the price term, were determined by DHS. (Morris Aff. ¶ 3; Handley Dep. 77-78.) The contract between the DHS and GSSC contains a hearing medical standard which permits the use of only one hearing aid:

> All uniformed guards and all security clerks must meet the following medical standards:
>
> * * * *
>
> (2) Hearing: Applicant must be able to hear the whispered voice at 15 feet with each ear. Using an audiometer for measurement, there should be no loss of 30 or more decibels <u>in each ear</u> at 500, 1000, and 2000 CPA levels. NOTE: *The use of a single hearing aid is permitted for one ear*, and is not disqualifying if the wearer can demonstrate that they meet these audiometer measurement requirements for both ears during their contract-required medical exam(s).

(Contract, Doc. 13-4 at 7 (italicized emphasis added).)

DHS, a former party to this lawsuit,[1] defended the hearing medical standard in a Response to Interrogatories propounded by GSSC. DHS asserted two main justifications for the one hearing aid policy:

> 1) The risks associated with a guard using two hearing aids, versus one hearing aid, included an increased likelihood of risk to a) the Government and b) the public if one or both hearing aids became defective due to electronic malfunction or degradation through reduction or loss of battery power. With one hearing aid in one ear, and the second hearing aid in the other, if the hearing aid failed (or fell out or was dislodged), the contract guard would still have one ear that was providing sufficient hearing to not endanger the Government or the public.

---

[1] On May 5, 2009, DHS filed a Stipulation of Dismissal signed by all parties in which Handley dismissed his claims against DHS pursuant to a settlement. (Doc. 57.)

> 2)  Second, the added risks to the Contract guard perhaps not hearing an audible warning, or not hearing an assailant's approach, is only increased with the use of a second hearing aid. The more points of failure that exist, the more risk is entailed. In using this Contract clause, the Government fairly balanced the rights of the individual with concerns for the safety of the individual guard, and protecting the Government and the public.

(Abrahamson Aff. Ex. H at 2-3.)

Prior to May 2006, Handley had not worn hearing aids.[2] He began to wear two hearing aids in May 2006 on the advice of physicians. (Handley Dep. at 67-68.) Handley's hearing loss is totally corrected with the use of the hearing aids.[3] In September 2006, after Handley's supervisor noticed Handley was wearing two hearing aids, GSSC advised Handley that it could not continue to assign him to duty as a federal security guard unless he satisfied the DHS hearing medical standard. Handley refused repeated GSSC requests to take the hearing test wearing only one hearing aid. (Handley Dep. 56, 59-60, 87-88.) After Handley's refusal, Gregory Morris, GSSC's Director of Government Operations, contacted DHS's contracting officer, Roger Pinnau, to explain the situation. Pinnau re-affirmed that DHS permitted security guards to wear only one hearing aid when taking the hearing test. When Morris inquired about transferring Handley to a security clerk position in a different federal building, Pinnau stated that the same hearing medical standard applied to the security clerk position. (Morris Aff. ¶¶ 5-6; Morris Dep. 33-34.) Morris testified at his deposition that he did not recall if he specifically asked Pinnau if Handley

---

[2] Handley had worn devices which he called "hearing enhancers" prior to May 2006. He ordered the hearing enhancers through the mail without a diagnosis or prescription from a physician. Handley attributes his hearing loss to exposure to loud noises during his prior military experience. (Handley Dep. 65-68, 71.)

[3] Neither party provided medical evidence to substantiate this undisputed conclusion regarding Handley's hearing ability.

could wear two hearing aids in an attempt to pass the hearing test. (Morris Dep. 34.)

GSSC removed Handley from duty in September 2006. GSSC told Handley that he was not permitted to work as a security guard pursuant to GSSC's contract with DHS unless he could satisfy the DHS hearing medical standard. GSSC asserted no basis to terminate Handley except for his failure to take and pass the hearing test wearing only one hearing aid. (Morris Dep. 57; Bennett Dep. 52.)

Handley continued working at other jobs after he was terminated by GSSC. Handley performed courier services for two companies several days per week and he applied for security positions with other companies. (Handley Dep. 28-29, 95-96.) Handley also owned and operated a security consulting firm as of the date of his deposition. (Id. at 21-24.) Handley asserts that he is able still to perform the functions of a security guard.

**B.     Procedural Posture**

On February 27, 2008, Handley filed an Amended Complaint (doc. 13). Handley alleges five claims against GSSC:

> (1) Disability Discrimination in Violation of the Americans with Disabilities Act ("ADA");
> (2) Retaliation in Violation of the ADA;
> (3) Disability Discrimination in Violation of Ohio Revised Code ("O.R.C.") Chapter 4112;
> (4) Retaliation in Violation of O.R.C. Chapter 4112; and
> (5) Violation of Ohio Public Policy.

(Id.) GSSC now moves for summary judgment as to all claims asserted against it.

**II.    STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

## III. ANALYSIS

### A. Disability Discrimination in Violation of the ADA and O.R.C. Chapter 4112

Handley asserts that GSSC violated the ADA and O.R.C. Chapter 4112 by failing to accommodate Handley's actual or perceived disability and by terminating Handley's employment on the basis of an actual or perceived disability. Handley alleges that he is disabled in that he has a physical impairment that impairs his major life activities of hearing and working.

5

He alleges that GSSC terminated him from his employment on the basis of his disability, despite the fact that he was qualified to serve as a security guard. He further asserts that GSSC failed to reasonably accommodate him by permitting him to wear two hearing aids in order to satisfy the DHS hearing medical standard.

Under the ADA as it existed in September 2006,[4] when GSSC terminated Handley, a disability was defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Similarly, a disability under Ohio law is "a physical or mental impairment that substantially limits one or more major life activities . . .; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment." O.R.C. § 4112.01(A)(13).

The ADA prohibits a covered employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The general prohibition against discrimination specifically includes "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter." 42 U.S.C. § 121112(b)(2).

---

[4] The ADA was amended by the ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (2008) ("ADAAA"). The ADAAA became effective on January 1, 2009 and it does not apply retroactively. See, e.g., Verhoff v. Time Warner Cable, Inc., 299 F. App'x 488, 494 (6th Cir. 2008); E.E.O.C. v. Agro Distribution, LLC, 555 F.3d 462, 469 n.8 (5th Cir. 2009); Vaughn v. Rent-A-Center, Inc., No. 2:06-cv-1027, 2009 WL 723166, at *3 n.1 (S.D. Ohio Mar. 16, 2009).

The general prohibition also forbids "using qualification standards . . . that screen out or tend to screen out an individual with a disability . . . unless the standard . . . is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

Similar to the ADA's general prohibition, Ohio law makes it unlawful for an employer, "because of the . . . disability . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." O.R.C. § 4112.02(A). Courts are permitted to look to regulations and cases interpreting the ADA when applying the Ohio law. Columbus Civil Serv. Comm'n v. McGlone, 82 Ohio St. 3d 569, 573, 697 N.E.2d 204 (1998); see also Knapp v. City of Columbus, 192 F. App'x 323, 328 (6th Cir. 2006) (same).

GSSC moves for summary judgment on the disability discrimination claims primarily on the basis that Handley is not disabled under the ADA or Ohio law and therefore is not entitled to protection under those laws. Significantly for purposes of this case, the Supreme Court instructed that a determination regarding whether a person is disabled must be made with consideration of that person's use of a corrective device. Sutton v. United Air Lines, Inc., 527 U.S. 471, 475 (1999).[5] The Supreme Court stated that a person's use of a corrective device does not, by itself, render a person non-disabled. Id. at 488. Rather, the person who uses the corrective device has an actual disability "if, notwithstanding the use of a corrective device, that

---

[5] The Court notes that Congress legislatively overturned Sutton in the ADAAA and instructed that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . hearing aids." ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, 3556 (2008).

7

individual is substantially limited in a major life activity." Id. In Sutton, the petitioners' use of eye glasses had to be considered when determining whether the petitioners were disabled. Applying Sutton, Handley's use of hearing aids similarly must be considered in the determination of whether he is disabled. See Ivy v. Jones, 192 F.3d 514, 516 (5th Cir. 1999) (considering use of hearing aids); Perkins v. Hook-Superx, Inc., No. 1:05-cv-818, 2007 WL 1577751, at *5 (S.D. Ohio May 30, 2007) (same).

The limited evidence presented to the Court demonstrates that Handley is not disabled when his use of hearing aids is considered. Handley affirmed at his deposition that his hearing is "fully corrected" with the use of two hearing aids. (Handley Dep. 52-53, 56.) Accordingly, Handley does not have an actual physical impairment that substantially limits a major life activity under either subsection (A) of the ADA, 42 U.S.C. § 12102(2), or under the first subsection of O.R.C. § 4112.01(A)(13). See Fraterrigo v. Akal Security, Inc., No. 06 Civ. 9861, 2008 WL 4787548, at *6 (S.D.N.Y. Oct. 29, 2008) (finding that a federal security officer was not disabled applying the Sutton standard because his hearing loss could be corrected with hearing aids).

Handley contends that his use of two hearing aids should not be considered despite the Supreme Court's instruction in Sutton because the DHS hearing medical standard does not permit him to wear two hearing aids. Handley attacks as a "shell game" or "circular argument" GSSC's position that (under Sutton) whether he has a disability must be determined with consideration of his use of two hearing aids, but that he is not permitted to wear two hearing aids to pass the DHS hearing test. Instead, Handley asserts that Sutton is inapplicable here because the case did not address the issue whether a plaintiff is to be considered disabled when the plaintiff's use of a corrective device is prohibited.

The Court disagrees with Handley's interpretation of Sutton and finds that its holding is applicable here. The facts in Sutton were closely analogous to those here and did involve the employer's prohibition of the corrective device required by the petitioners to ameliorate their physical impairments. The petitioners in Sutton, twin sisters, suffered from severe myopia. 527 U.S. at 475. Each petitioner had uncorrected visual acuity of 20/200 or worse in the right eye and 20/400 or worse in the left eye. Id. However, with the use of corrective measures such as glasses or contact lenses, the petitioners "function[ed] identically to individuals without a similar impairment." Id. The petitioners applied to be commercial airline pilots with United Air Lines ("United"). Id. United denied the petitioners the opportunity to interview for the pilot positions and did not hire the petitioners because United had a minimum vision requirement of uncorrected visual acuity of 20/100 or better. Id. at 476. The Court found that the Sutton petitioners were not disabled under subsection (A) of the ADA because, with corrective measures, their visual acuity was 20/20 and they "function[ed] identically to individuals without a similar impairment." Id. at 488-89.

The facts in this case cannot be distinguished. Handley is not disabled despite the fact that his hearing may be impaired without the use of two hearing aids, in the same manner as the Sutton petitioners were not disabled despite their poor vision without the use of corrective lenses. The Fraterrigo case also supports this result. The plaintiff in Fraterrigo worked as court security officer at a federal courthouse in New York. 2008 WL 4787548, at *1. The United States Marshals Service ("USMS") set the medical standards for security officers at the courthouse. Id. at *2. The USMS medical standards required security officers to pass a hearing examination without the use of any hearing aids. Id. at *3. The plaintiff was not able to pass the hearing

9

examination without the use of a hearing aid and his employment was terminated. Id. at *1-2. Similar to Handley, the plaintiff in Fraterrigo filed suit under the ADA and state law. Id. at *1. The plaintiff argued that he should have been permitted to meet the USMS hearing standards with the use of a hearing aid. Id. at *6. The court disagreed and found that the plaintiff was not disabled under the ADA as interpreted in Sutton. Id. "[I]f Fraterrigo's hearing loss can be corrected with hearing aids, his hearing loss is a physical impairment that, following the clear mandate of the Supreme Court in Sutton, is not covered by the ADA." Id. The same result applies here.

Anticipating a potential holding that he did not have an actual disability, Handley argues in the alternative that he was regarded as having a disability pursuant to 42 U.S.C. § 12102(1)(C), and under the third subsection of O.R.C. § 4112.01(A)(13). The Supreme Court in Sutton explained that an individual can be "regarded as" having a disability in two circumstances:

> (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual – it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

527 U.S. at 489. Handley alleges here that GSSC regarded him as substantially limited in the major life activities of hearing and working.

To begin, the fact that GSSC required compliance with the DHS hearing medical standard does not in and of itself establish that GSSC regarded an employee who could not meet the standard as disabled. The Supreme Court rejected this type of argument in Sutton:

> Standing alone, the allegation that respondent has a vision requirement in place does not establish a claim that respondent regards petitioners as substantially

> limited in the major life activity of working. By its terms, the ADA allows employers to prefer some physical attributes over others and to establish physical criteria. An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity. Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment – such as one's height, build, or singing voice – are preferable to others, just as it is free to decide that some limiting, but not substantially limiting, impairments make individuals less than ideally suited for a job.

Id. at 490.

Next, Handley provides no evidence to support its argument that GSSC regarded Handley as substantially limited in his ability to hear. The fact that GSSC became aware that Handley had a hearing impairment because his supervisor witnessed him wearing hearing aids is not sufficient. Handley must demonstrate that GSSC regards "the impairment [as] limit[ing] a major life activity." Toyota Motor Mfg., KY, Inc. v. Williams, 534 U.S. 184, 195 (2002).[6] Handley points to only the fact that GSSC required Handley to pass the DHS hearing test after discovering he used hearing aids. Again, this fact does not equate to a perception that Handley's hearing was substantially limited. See Sutton, 527 U.S. at 490; Walton v. U.S. Marshals Serv., 492 F.3d 998, 1007 (6th Cir. 2007) ("[A]n allegation that an employer which requires its employees to meet certain vision standards does not establish a claim that the employer regards one who fails to meet the vision requirement as being substantially limited in the major life activities of working or seeing."). Rather, two GSSC managers testified without contradiction that GSSC's concern was that Handley satisfy the hearing standard set forth in GSSC's contract with DHS. (Bennett Dep. 51-52, 61; Morris Dep. 56-57.)

---

[6] Congress also legislatively overturned Toyota Motor Mfg., Ky, Inc. in the ADAAA. ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, 3553-54 (2008)

Likewise, Handley has not established with evidence that GSSC regarded Handley as substantially limited in the major life activity of working. "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." Sutton, 527 U.S. at 491. Stated differently, "[t]o be substantially limited in the major life activity of working . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." Id. at 492. This is a difficult standard for a plaintiff to meet, particularly at the summary judgment stage, because "it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform." Ross v. Campbell Soup Co., 237 F.3d 701, 709 (6th Cir. 2001). Here, a reasonable jury could not find that GSSC considered Handley to be unable to work in a broad class of jobs.

Rather than considering Handley unable to work in a broad class of jobs, the evidence suggests that GSSC considered Handley to be able to perform even security-related jobs but for the DHS contract requirements. GSSC managers testified that to their knowledge Handley would not have been terminated but for the hearing test issue. (Bennett Dep. 51-52; Morris Dep. 56-57.) Gregory Morris testified that Handley "was a fine officer" and he sought to transfer Handley to a security clerk position until he was informed by DHS that the hearing medical standard applied to that position as well. (Morris Dep. 33-34; Bennett Dep. 65.) Another GSSC manager testified that GSSC was satisfied with Handley's job performance prior to his refusal to take the hearing test and that other security guards had not expressed concern about Handley's ability to perform his duties. (Bennett Dep. 52, 61.) Additionally, Handley points to no evidence that GSSC considered him unable to work after his termination. Morris testified that he knew Handley

12

operated and intended to continue to operate an independent security business separate from his work for GSSC. (Morris Dep. 56.) In sum, Handley has not provided sufficient evidence upon which a reasonable jury could conclude that GSSC regarded him as unable to work in or serve in any type of position except for the security positions in federal buildings for which the DHS hearing standard applied.

The primary case upon which Handley relies to support his argument that GSSC regarded him as disabled arises from similar facts, but it is distinguishable. In Ruiz v. Mukasey, 594 F. Supp. 2d 738 (S.D. Tex. 2008), an appeals court upheld a jury verdict in favor of a court security officer who was terminated for his inability to pass the USMS hearing standard without the use of a hearing aid. The plaintiff was able to pass the hearing examination with the use of a hearing aid. Id. at 740. The jury found that the plaintiff was qualified for the position of a security officer and that he was terminated because the USMS regarded him as disabled. Id. at 740, 742. The discussion in the opinion of the evidence presented at the trial is limited. It is not clear upon what facts the jury determined that the security company regarded the plaintiff as disabled. This Court will not follow Ruiz as persuasive authority. There is no indication in the Ruiz decision that the defendants raised or that the court applied the Sutton corrective measures doctrine. That is, there is no indication that the court considered whether the defendants regarded the plaintiff as disabled when he wore his hearing aid. Additionally, as explained above, the evidence here establishes at most that GSSC regarded Handley as having failed to satisfy the DHS hearing medical standard, not as being substantially limited in the major life activities of hearing or working.

In sum, the Court holds that there are no material facts in dispute and that Handley is not disabled under the ADA or O.R.C. Chapter 4112 as a matter of law. Accordingly, GSSC is

13

entitled to summary judgment on the disability discrimination claims.

B.    **Disability Retaliation in Violation of the ADA and O.R.C. Chapter 4112**

Handley can pursue a retaliation claim pursuant to the ADA and Ohio law despite the fact that he is not a qualified person with a disability. See Braud v. Cuyahoga Valley Career Center, No. 1:06-cv-1059, 2007 WL 2816210, at *13 (N.D. Ohio Sept. 27, 2007) (citing Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 188 (3d Cir. 2003); Selenke v. Med. Imaging of Colorado, 248 F.3d 1249, 1264 (10th Cir. 2001)). A plaintiff establishes a prima facie case of disability discrimination with evidence of the following: (1) he engaged in a protected activity; (2) the employer knew about the protected activity; (3) the employer took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. Gembus v. Metrohealth Sys., 290 F. App'x 842, 846 (6th Cir. 2008) (analyzing Ohio law); Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 814 (6th Cir. 1999) (applying ADA).

GSSC moves for summary judgment on this claim as well. To the extent that GSSC argues that it is entitled to summary judgment on the basis that Handley was not disabled, that argument is rejected. However, GSSC also asserts that it terminated Handley because of his failure to take and pass the DHS hearing testing while wearing at most one hearing aid, not for a retaliatory reason. GSSC supervisors testified that Handley was terminated because he did not "meet[ ] the physical requirements of the contract," or stated differently, because he refused to take the hearing test wearing only one hearing aid. (Bennett Dep. 52; Morris Dep. 57.) Handley's attorneys even admit in their brief that "[GSSC] based its decision to terminate Mr. Handley's employment solely on his failure to meet the hearing requirement policy of the contract

14

between [GSSC] and DHS using a maximum of one hearing aid." (Doc. 55 at 10-11 (emphasis added).) Given this agreement between the parties as to the basis for Handley's termination, Handley cannot establish a causal connection between any protected activity he took and his termination. The Court holds that GSSC is entitled to summary judgment on Handley's disability retaliation claims.

C.     **Discrimination in Violation of Ohio Public Policy**

Handley alleges in his Amended Complaint that GSSC violated Ohio public policy by discriminating against him on the basis of his alleged disability. (Doc. 13 at 11-12.) The Court has held that GSSC did not discriminate against Handley on the basis of an actual or perceived disability. This is a sufficient basis to deny the Ohio public policy claim. Moreover, Ohio Revised Code Chapter 4112 adequately vindicates Ohio's public policy against disability discrimination, foreclosing a separate cause of action for violation of public policy. Caplinger v. Uranium Disposition Services, LLC, No. 2:08-cv-548, 2009 WL 367407, at *6 (S.D. Ohio Feb. 11, 2009); Bialaszewski v. Titanium Metals Corp., No. 2:06-cv-1063, 2008 WL 2387059, at *5 (S.D. Ohio June 11, 2008).

In his brief, Handley contends that his public policy claim is based on a violation of the public policy expressed in O.R.C. §§ 4167.01 et seq. regarding safe working conditions in public employment. Handley asserts that he sent a letter to his U.S. Representative Jean Schmidt in April 2007 regarding the safety of his work environment. Handley did not provide a citation to the evidentiary record to support this assertion. Regardless, given that Handley was terminated in or about September 2006, the Court knows of no adverse employment action which GSSC took against Handley because of this alleged protected conduct. Handley's claim fails on this

additional basis as well.  Accordingly, GSSC is entitled to summary judgment on the public policy claim.

**IV.     CONCLUSION**

For the foregoing reasons, the Court **GRANTS**  Defendant GSSC's Motion for Summary Judgment (doc. 50) as to all claims.

IT IS SO ORDERED.


    s/Susan J. Dlott    
Chief Judge Susan J. Dlott
United States District Court